IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TRACY KEITH,

          Plaintiff,

v.

RICHARD D. KOERNER and
ANASTACIO GALLARDO,

          Defendants.

Case No. 11-CV-2281-DDC-JPO

## MEMORANDUM AND ORDER

Plaintiff Tracy Keith, a former inmate, filed a civil rights complaint under 42 U.S.C. § 1983, alleging violations of her rights under the Eighth Amendment. She originally named several Kansas Department of Corrections ("KDOC") employees as defendants. Now, only two remain: Richard Koerner and Anastacio Gallardo. This matter comes before the Court on defendant Koerner's Second Motion for Summary Judgment (Doc. 88). For the following reasons, the Court grants Koerner's motion.

### I. Background

Plaintiff was an inmate at the Topeka Correctional Facility ("TCF"), an all-female Kansas state prison, between November 2006 and May 2010. While incarcerated, she participated in a vocational training program. As part of this program, plaintiff took a class taught by defendant Gallardo, and she also helped him perform certain maintenance duties at TCF. On October 2, 2007, plaintiff and another inmate traveled with Gallardo to retrieve a sink from a storage building. There, Gallardo engaged in unlawful sexual acts with plaintiff, and she became pregnant as a result. The Topeka Police Department then conducted an investigation

1

which ultimately led to Gallardo pleading guilty in June 2008 to a charge of unlawful sexual relations and two charges of trafficking contraband.

In May 2011, plaintiff filed this lawsuit alleging that prison employees, including Koerner, had violated her Eighth Amendment rights (Doc. 1). She alleges that Koerner was deliberately indifferent to a substantial risk of harm by (1) failing to train employees about sexual misconduct and (2) tolerating sexual contact between inmates and prison staff. On September 13, 2013, Koerner filed a motion for summary judgment arguing that the applicable statute of limitations had expired, which barred plaintiff's claim against him (Doc. 72). The Court denied this motion on November 18, 2014 (Doc. 82). On March 16, 2015, Koerner filed a second motion for summary judgment, arguing that he is entitled to qualified immunity on plaintiff's claim. Plaintiff filed a response (Doc. 92), and this motion is now ripe for decision.

## II. Legal Standard

### A. Summary Judgment Generally

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.*

(quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### B. Qualified Immunity

#### 1. Generally

The summary judgment analysis changes, however, when a defendant asserts a qualified immunity defense. When a defendant moves for summary judgment based on a qualified immunity defense, the burden shifts to the plaintiff to demonstrate that (1) the defendant violated her constitutional or statutory rights and (2) the right was clearly established at the time of the alleged unlawful activity. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). "In their discretion, courts are free to decide which prong to address first 'in light of the circumstances of the particular case at hand.'" *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quoting *Pearson*, 555 U.S. at 236). "Ultimately, the record must clearly demonstrate the plaintiff has satisfied [t]his heavy two-part burden; otherwise, the defendant is entitled to qualified immunity." *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015) (citation, quotation marks, and brackets omitted).

#### 2. Supervisory Liability

Koerner did not participate personally in Gallardo's alleged sexual assault of plaintiff. Therefore, to impose liability on Koerner for Gallardo's alleged constitutional violation, plaintiff must establish Koerner's liability in a supervisory capacity. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). This requires Koerner to show an "affirmative

link" between the supervisor's actions and the constitutional violation. *Id.* This "affirmative link" has three related prongs: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). Plaintiff must satisfy all three prongs to recover against Koerner under § 1983. *See Schneider*, 717 F.3d at 767.

A plaintiff can establish the first prong—personal involvement—by showing that "the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that caused the constitutional harm." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (quotation omitted). The second prong—sufficient causal connection— requires the plaintiff to show that the defendant's actions caused the constitutional violation. *Schneider*, 717 F.3d at 768. "A plaintiff must establish the requisite causal connection by showing the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Id.* (brackets, citations, and quotation marks omitted). Under the third prong—a culpable state of mind—the plaintiff must show that that the defendant took the allegedly wrongful actions with the requisite state of mind. *Id.* at 769. For an Eighth Amendment claim, this element requires the plaintiff to show that the defendant acted with deliberate indifference. *See Boyett v. Cnty. of Washington*, 282 F. App'x 667, 681 (10th Cir. 2008).

The Supreme Court and our Circuit have explained that the "deliberate indifference" requirement imposes a substantial standard on Eighth Amendment plaintiffs. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a [state or] municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). "Deliberate indifference can be satisfied by

4

evidence showing that the defendant knowingly created a substantial risk of constitutional injury." *Schneider*, 717 F.3d at 769 (citation omitted).  The governing cases also establish that inaction, in certain instances, can satisfy this requirement.  *Id.* at 771.  "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff."  *Id.* at 769 (citation omitted).

### III. Analysis

Koerner bases his summary judgment motion on two principal arguments.  He argues that he is entitled to summary judgment because (1) plaintiff consented to have sex with Gallardo and (2) plaintiff has failed to establish that Koerner is liable in his supervisory capacity.  The Court addresses each argument in turn.

### 1.   Did Plaintiff Consent to Have Sex With Gallardo?

Koerner cannot be held liable in his individual capacity under a theory of supervisory liability if no underlying violation of plaintiff's constitutional rights occurred.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (explaining that supervisory liability requires a constitutional deprivation affirmatively linked to the supervisor's personal participation).  Koerner first argues that he is entitled to summary judgment because plaintiff has not shown that any prison official violated her constitutional rights.

"Sexual abuse of an inmate by an officer violates the Eighth Amendment."  *Graham v. Sheriff of Logan Cnty.*, 741 F.3d 1118, 1122 (10th Cir. 2013).  "'Like the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses

against society.'" *Id.* at 1122-23 (quoting *Giron v. Corrs. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999)).

The Tenth Circuit "treat[s] sexual abuse of prisoners as a species of excessive-force claim, requiring at least some form of coercion (not necessarily physical) by the prisoner's custodians." *Id.* at 1126. "[W]hen a prisoner alleges rape by a prison guard, the prisoner need prove only that the guard forced sex [on the prisoner] in order to show an Eighth Amendment violation." *Id.* at 1123. However, consent to sexual intercourse is a complete defense to an excessive force claim. *See id.* (granting summary judgment against the plaintiff's Eighth Amendment claim "because there is no genuine dispute that [the defendants] did not force [the plaintiff] to have sex, making all other issues irrelevant"). Still, courts must "examine consent carefully in the prison context" because "the power dynamics between prisoners and guards make it difficult to discern consent from coercion." *Id.* at 1120, 1126 (quotation omitted).

Koerner argues that he is entitled to summary judgment because plaintiff consented to have sex with Gallardo and no genuine issue of fact exists about that consent. The summary judgment facts, viewed in the light most favorable to plaintiff, establish that plaintiff knew Gallardo because he taught a vocational class in which she was enrolled. On October 1, 2007, Sandra McMillan, another inmate, approached plaintiff with a proposition. McMillan told plaintiff that Gallardo would help her "financially" if plaintiff had some kind of a sexual interaction with him. Doc. 89 at ¶ 9. McMillan did not specify the type of sexual interaction Gallardo had in mind. This offer surprised plaintiff, but she told McMillan that she would think about it. Plaintiff told McMillan that "if [she] were to do this, [she] would only give him oral sex." Doc. 89 at ¶ 13. Plaintiff knew that prison regulations prohibited any type of sexual contact with staff, but she did not report her conversation with McMillan to prison authorities.

Plaintiff explains this decision by saying that she feared she would have "caught flak" from other inmates for "snitching."  *Id.* at ¶ 15.

Plaintiff spent the night of October 1—the day when McMillan presented this proposition—thinking about it.  At her deposition, plaintiff outlined her decision-making process:  "Where at first I'd thought it would be money put on my books[,] then I realized it would be tobacco.  So I really didn't want to have sex with him because I have no use for tobacco and didn't want the extra trouble it would cause."  *Id.* at ¶ 16.  The next day, on October 2, 2007, McMillan again approached plaintiff.  Plaintiff informed McMillan that she had not decided whether to have any kind of sexual interaction with Gallardo.  But McMillan said that if it was going to happen, it had to be that day.  Plaintiff then agreed to perform oral sex on Gallardo.

Soon afterwards, plaintiff, McMillan, and Gallardo left the prison facility maintenance building in a van to retrieve a sink from an abandoned gym.  At that time, the gym was used only to store things like sinks and toilets, and otherwise was not occupied.  Prison officials kept the gym padlocked, but Gallardo had a key.  When they entered the gym, McMillan and Gallardo walked around looking for a sink.  Eventually, they entered a room underneath a staircase.  McMillan called plaintiff into the room.  When plaintiff came in, McMillan asked her to show Gallardo her breasts.  Plaintiff lifted her shirt and bra and showed Gallardo her breasts.  Gallardo proceeded, as plaintiff termed it, to "lick on them."  *Id.* at ¶ 23.  Then, plaintiff got down on her knees and proceeded to perform oral sex on Gallardo.  During this time, McMillan was moving in and out of the room, watching the sexual interaction, and, possibly, acting as a lookout.  Plaintiff describes the rest of the encounter as follows:

> He pulled me back up and started to take my pants down.  I told him that I didn't think that this was a good idea and he shushed me by kissing me and took my

> pants down . . . . [H]e turned me around and told me to get on my knees. . . . He entered me from behind and in roughly 3 seconds he ejaculated inside of me.  It all happened so fast and even though I had decided not to have intercourse with him it was just easier to go along with it.  We got up, situated ourselves, got the sink and left.

*Id.* at ¶ 26.  Plaintiff testified that she did not tell Gallardo that she only was willing to perform oral sex, but not engage in sexual intercourse with him.  Gallardo also has asserted that McMillan never told him that plaintiff was willing only to engage in oral sex.

In the weeks after plaintiff's sexual interaction with Gallardo on October 2, McMillan asked plaintiff several times to participate in a "threesome" with Gallardo and her.  Plaintiff said "no" each time and was able to "put an end" to any further sexual misconduct.  *Id.* at ¶ 28.  Plaintiff said that she did not want to engage in such activity again because she "wasn't getting anything out of it" and did not want to participate in homosexual sex.  *Id.* at ¶ 30.  Plaintiff never discussed sex directly with Gallardo; the October 2 interaction was brokered entirely through inmate McMillan, and McMillan conveyed all subsequent propositions of sexual conduct involving Gallardo.  Plaintiff did not immediately report to prison officials that she had engaged in sexual activity.

Koerner argues that these facts are "nearly identical" to those presented in a recent Tenth Circuit decision, *Graham v. Sheriff of Logan County*, 741 F.3d at 1120.  There, two prison guards had sex with the plaintiff, an inmate in solitary confinement at the Logan County jail in Oklahoma.  *Id.*  In the early morning of October 9, 2009, the two guards entered the plaintiff's cell and alternated having sexual intercourse with the plaintiff and receiving oral sex from her.  *Id.* at 1121.  The two guards later admitted to the incident and were fired.  *Id.* at 1120.  The plaintiff-inmate then sued the two guards and the county sheriff.  She claimed, as does plaintiff here, that they violated her Eighth Amendment rights under § 1983.  *Id.*  The Tenth Circuit

affirmed the district court's grant of summary judgment for the defendants because it concluded that "there is no genuine dispute that [the two prison guards] did not force [the plaintiff] to have sex, making all other issues irrelevant." *Id.* at 1123.

In *Graham*, the Tenth Circuit recognized the need to "examine consent carefully in the prison context" but nevertheless found "overwhelming evidence of consent." *Id.* at 1120, 1124. The plaintiff had participated in sexually-oriented conversations with one of the guards for an extended period before she participated in the sex acts with them. *Id.* at 1123. The plaintiff admitted that she had flashed one of the guards and had written him notes that made it clear that she wanted to have sex with him. *Id.* She told the other prison guard about her fantasies and told him that she wanted to have a "threesome" with the two guards. *Id.* On the night of the sexual encounter, the plaintiff did nothing to suggest that she did not consent when they entered her cell, when they removed her clothing, or when they touched her. *Id.* In her lawsuit, the plaintiff claimed that she did not want to have sex with one of the guards. *Id.* But she conceded that she never expressed her reluctance at the time of the sexual conduct. *Id.*

The Court finds one aspect of *Graham* particularly significant. During the sexual encounter, one of the guards dropped his radio. *Id.* at 1121. This caused the plaintiff to stand up, at least partially, but the guard pushed her head back toward the other guard, saying, "Bend over, bitch," and "Shhh." *Id.* The Tenth Circuit emphasized, however, that it did not consider this fact in its analysis of the consent issue because the argument section of the plaintiff's opening brief had not referenced the officer pushing her head down. *Id.* at 1123-24. The court explained, though, that if the plaintiff properly had argued this fact, "it might otherwise support a partial reversal and remand." *Id.* at 1124.

The Court concludes that the facts of this case are sufficiently different from *Graham* to present a triable issue of fact about consent.  The summary judgment facts establish that plaintiff consented to oral sex.  But she never explicitly consented to have sexual intercourse with Gallardo.  In *Graham*, the plaintiff did not indicate any reluctance to have sex with the guards. But the summary judgment facts here differ.  At some point while plaintiff was performing oral sex, Gallardo pulled her to her feet and "started to take her pants down."  Doc. 89 at ¶ 26. Plaintiff told Gallardo that she "didn't think this was a good idea," but he "shushed [her] by kissing [her]."  *Id.*  Gallardo then turned plaintiff around, told her to get on her knees, and penetrated her.  *Id.*  In the Court's view, a reasonable jury might conclude from these facts that plaintiff never consented to engage in sexual intercourse with Gallardo.  As *Graham* notes, that one of the officers had pushed the plaintiff's head down during sex "might . . . support a partial reversal and remand" had plaintiff properly asserted the argument.  *Id.* at 1123-24.  Plaintiff here manifested her reluctance to have sex more clearly than did the *Graham* plaintiff, *i.e.*, plaintiff said having sex was not a "good idea," but Gallardo shushed her and then quickly began having sexual intercourse with her.

"The power dynamics between prisoners and guards make it difficult to discern consent from coercion."  *Graham*, 741 F.3d at 1126 (quotation omitted).  Unlike *Graham*, the record here presents a genuine issue of material fact whether plaintiff consented to have sexual intercourse with Gallardo.  For this reason, the Court rejects Koerner's summary judgment argument that plaintiff consented to sexual intercourse.

### 2.  Is Koerner Liable As a Supervisor?

Next Koerner argues that he is entitled to qualified immunity because plaintiff has not shown that he violated her Eighth Amendment rights in his capacity as a supervisor.  On a

summary judgment motion that relies on a qualified immunity defense, the burden shifts to the plaintiff to demonstrate that (1) the defendant violated her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged unlawful activity.  *Pearson*, 555 U.S. at 232.  In an order affirming the Court's denial of Koerner's motion to dismiss in this case, the Tenth Circuit held:  "As an initial matter, it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." *Keith*, 707 F.3d at 1188.  The Tenth Circuit therefore concluded that plaintiff's legal theory satisfies the second prong of the qualified immunity test.  It then proceeded to analyze the first prong of the test—whether plaintiff had pleaded a violation of her constitutional rights sufficiently.  *Id.* at 1189-90.  Applying this binding authority, the Court concludes that if the summary judgment facts would permit a reasonable jury to find that Koerner was deliberately indifferent to sexual abuse during his time as warden at TCF, it would support a conclusion that he violated plaintiff's clearly established Eighth Amendment rights.

But for reasons explained in the next two subsections, the Court concludes that plaintiff has failed to meet her burden under the first prong of the qualified immunity analysis—*i.e.*, to present facts from which a rational jury could find that Koerner was deliberately indifferent.  As a result, the Court grants Koerner's motion for summary judgment.

### a.  Did Koerner Fail to Train Prison Staff Adequately?

Plaintiff argues that Koerner violated her Eighth Amendment rights by failing to train prison officials about sexual misconduct.  As discussed above, a supervisor is liable only when the plaintiff establishes an "affirmative link" between the supervisor's actions and the constitutional harm.  *Schneider*, 717 F.3d at 767.  This "affirmative link" has three related

11

prongs:  (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind.  *Dodds*, 614 F.3d at 1195.

Where a plaintiff alleges deliberate indifference based on a supervisor's failure to train subordinates, the plaintiff must show "a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable."  *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988).  "It is not enough . . . for [a plaintiff] to show that there were general deficiencies in the county's training program for jailers."  *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).  "Rather, [the plaintiff] must identify a specific deficiency in the county's training program closely related to [her] ultimate injury, and must prove that the deficiency in training actually caused [her] jailer to act with deliberate indifference to [her] safety."  *Id.*  Plaintiff has failed to shoulder this burden here.

The undisputed facts show that Koerner trained prison staff, including Gallardo, that sexual misconduct involving prisoners was prohibited.  On Gallardo's first day working for TCF, December 18, 2006, he signed a form acknowledging that he had read the KDOC Internal Management Policy and Procedure ("IMPP") 02-118.  Doc. 89-4 at 3.  IMPP 02-118 provides that the KDOC "absolutely forbids acts of undue familiarity, including sexual misconduct, with offenders."  Doc. 89-3 at 6.  The policy defines "sexual misconduct" as "[s]exual behavior that is directed by an employee toward an offender(s) under the supervision of the [KDOC]," including "acts or attempts to commit acts of sexual abuse, sexual contact, . . . [and] unlawful sexual relations."  *Id.* at 7.  Gallardo acknowledged that he understood that "a violation of any rule of conduct shall be grounds for a disciplinary action, up to and including dismissal."  Doc. 89-4 at 3.  Also, as part of his training, Gallardo read K.S.A. § 21-3520, which imposes criminal sanctions on guards who engage in unlawful sexual relations with inmates.  *Id.*  Gallardo

affirmed his understanding that violating this statute "shall be grounds for dismissal and may also result in prosecution for [a] felony offense." *Id.* And Gallardo (along with all TCF staff), received specific training about sexual misconduct with female inmates.

Plaintiff responds to these undisputed facts with evidence that, she claims, creates a factual dispute entitling her to have a jury decided whether Koerner was "presented with an obvious risk of constitutional harm" that "almost inevitably" resulted in her constitutional injury. *Schneider*, 717 F.3d at 769. She relies on a 2010 Performance Audit Report prepared by a state of Kansas audit committee that, among other things, recommended changes to prevent sexual misconduct in Kansas prisons.[1] Doc. 92-5 at 4. Plaintiff argues that this report identifies several specific deficiencies in TCF's training. For instance, the report concluded that:

- The Topeka facility [] has failed to provide targeted training based on the population they serve. Female staff at Lansing and El Dorado Correctional Facilities receive training tailored to working with male inmates. However, male staff at [TCF] don't receive tailored training for working with female inmates. As noted earlier, officials told us that working with female inmates is different and creates unique issues, such as pat searches, privacy concerns, and the more social nature of female inmates.[2] *Id.* at 29.

- There are a few areas where the Department's policies and procedures fall short. For example: . . . There are no specific training requirements for investigative staff. The policy needs to specify the training and the curriculum for investigators. *Id.* at 30.

---

[1] The Audit Report is admissible evidence that the Court may consider on this motion because it is a "Public Record" under Fed. R. Evid. 803(8). It sets out "factual findings from a legally authorized investigation," and Koerner has failed to show that the report is so untrustworthy that the Court should exclude it. Fed. R. Evid. 803(8).

[2] Koerner argues that this section of the report is an error and that all TCF employees received training about female inmates. *See* Doc. 97 at 3. Indeed, Koerner correctly notes that plaintiff *admits* that "Gallardo—like all TCF staff—was also given specific training tailored to issues of supervising female inmates and staff-inmate relations." Doc. 92 at ¶ 53. But even if the Court assumes that the quoted passage from the Performance Audit Report is true, it does not contradict Koerner's assertion that all TCF employees received training to avoid sexual misconduct with inmates. *See id.* Thus, the Court finds uncontroverted the fact that TCF trained employees to avoid sexual misconduct.

- The Department has a policy that says investigators will receive specialized training, [but] doesn't specify what that training will be. *Id.* at 32.

Plaintiff argues that the Performance Audit Report shows that training was inadequate at TCF. Perhaps this is so, but the report's findings provide no basis for a rational jury to conclude that Koerner completely "fail[ed]" to train Gallardo about sexual misconduct or only provided "training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade*, 841 F.2d at 1528. Plaintiff also fails to explain how these purported deficiencies in training "actually caused" Gallardo to engage in sexual misconduct with her. *Lopez*, 172 F.3d at 760. Indeed, the identified deficiencies are unconnected to the sexual misconduct that occurred here. For instance, plaintiff does not show how better training for "investigative staff" or about "pat searches, privacy concerns, and the more social nature of female inmates" would have prevented the sexual misconduct that occurred here. *Id.* at 30, 32. And plaintiff does not contend that Gallardo mistakenly believed TCF permitted sexual contact between inmates and guards. *Lopez*, 172 F.3d at 760. On the contrary, the summary judgment facts establish that Gallardo actually was informed that sexual contact with inmates was strictly forbidden.

Next, plaintiff argues that Koerner failed to train Gallardo properly because he did not mandate a "zero tolerance" policy towards sexual misconduct, at least explicitly, until well after the incident in this case. According to plaintiff, the 2003 federal Prison Rape Elimination Act mandated that prisons adopt a zero tolerance approach to sexual misconduct. In response, Koerner argues that even if TCF did not use the words "zero tolerance" explicitly in a formal policy, it had a *de facto* zero tolerance policy toward sexual misconduct during his entire tenure as warden. Specifically, Koerner testified that he either fired every prison employee whom he found had engaged in sexual misconduct with an inmate, or permitted them to resign. Koerner also testified that he required employees who resigned to sign an agreement promising that they

14

would never again apply for employment at any corrections facility or law enforcement agency and authorizing TCF to disclose to potential employers the reasons the employee had resigned. Also, Koerner referred cases of sexual misconduct to prosecutors when, in his judgment, sufficient evidence existed that sexual contact had occurred between an employee and an inmate in violation of K.S.A. § 21-3520.

Plaintiff disputes that TCF had the equivalent of a zero tolerance policy for sexual misconduct. But plaintiff fails to support her assertion with any admissible evidence that could controvert Koerner's factual analysis. Indeed, she has failed to come forward with even one example where an employee continued to work at TCF after he was found to have engaged in sexual misconduct with an inmate. Nor is there any evidence that prison officials thought that they could continue working at TCF if they were found to have engaged in sexual misconduct. And by signing IMPP 02-118, Gallardo acknowledged that he understood that the punishment for violating K.S.A. § 21-3520, which prohibits unlawful sexual relations between guards and inmates, "shall be grounds for dismissal . . . ." Doc. 89-4 at 3. From these undisputed facts, the Court concludes that no rational jury could find that Koerner acted with deliberate indifference to an obvious risk of safety by failing to adopt an explicit "zero tolerance" policy for sexual misconduct.

Plaintiff makes two other arguments trying to support her failure to train theory. First, she asserts that Koerner ignored an "incredibly long list of continuing sexual violations" by, presumably, TCF employees. Doc. 92 at 62. But plaintiff fails to support this assertion with any facts from the record. Indeed, the entirety of her argument consists of the single clause quoted above. Because plaintiff has not supported this statement in the fashion required by the summary judgment standard, the Court rejects it. *See* Fed. R. Civ. P. 56(c); *see also Perry v. Woodward,*

199 F.3d 1126, 1141 n.13 (10th Cir.1999) (declining to address argument that was "not adequately developed"); *Rieck v. Jensen*, 651 F.3d 1188, 1191 n.1 (10th Cir.2011) ("[A]n argument is not preserved by merely alluding to it in a statement of facts."). Second, plaintiff, citing Koerner's deposition testimony, argues that he "declared fatigue with, and absence of 'concern' about, sexual abuse issues." Doc. 92 at 62. But plaintiff mischaracterizes Koerner's testimony. He testified, "It gets frustrating that it seems like I have to deal with so many [staff issues] and they are so time consuming and that there are other things that I would rather deal with than undue familiarity or staff issues." Doc. 92 at 61. Thus, nothing in the cited testimony mentions sexual misconduct. And even if it did, plaintiff makes no argument about how Koerner's testimony supports a failure to train claim.

In sum, the evidence shows that Gallardo knew he was violating KDOC policy when he engaged in sexual misconduct with plaintiff. As a result, a reasonable factfinder could reach just one conclusion: Koerner trained Gallardo that sexual relations with inmates was strictly prohibited and it was Gallardo's illegal actions, in defiance of his training, that caused his deplorable treatment of plaintiff. *See Porro v. Barnes*, 624 F.3d 1322, 1328-29 (10th Cir. 2010) (granting summary judgment for county officials when the record showed that the county "actively sought to protect [the plaintiff's] rights and it was (only) [a prison employee's] improper actions, taken in defiance of county policy, that caused" the plaintiff's injuries). As awful as Gallardo's conduct was, the summary judgment facts do not provide a basis for a rational jury to find that Koerner violated plaintiff's Eighth Amendment rights by failing to train Gallardo adequately. As a result, plaintiff has not met the burden imposed on her by the first prong of the qualified immunity test.

**b. Did Koerner Tolerate Sexual Misconduct by Failing to Terminate or Discipline Prison Staff?**

Plaintiff also argues that Koerner tolerated sexual misconduct between prison staff and inmates by failing to terminate or discipline staff who had engaged in inappropriate conduct. Specifically, the argument section of plaintiff's opposition to Koerner's motion for summary judgment asserts that Koerner tolerated sexual misconduct by: (1) failing to adopt a zero tolerance policy towards sexual contact between inmates and prison staff; (2) failing to take action against Gallardo after another inmate complained about his behavior; and (3) failing to fix problems with TCF's vocational training program.

First, as already discussed, plaintiff has failed to adduce any admissible evidence that any prison employee continued working at TCF during Koerner's time as warden after a claim of sexual misconduct was substantiated. Thus, plaintiff has failed to show that Koerner tolerated sexual misconduct by not implementing a formal zero tolerance policy.[3]

Second, plaintiff argues that Koerner tolerated sexual misconduct when he received a complaint about Gallardo from another inmate yet failed to take significant action against him. On July 9, 2007, about three months before Gallardo's sexual contact with plaintiff, Kelley Lane submitted an eight-page, handwritten statement to a prison official. This statement complained at length about Gallardo. Lane was enrolled in the same class as plaintiff, the vocational class that Gallardo taught. She complained that Gallardo had been picking on her and had been discussing inappropriate topics. Among other things, she asserted that:

- Gallardo "started talking about me and my life with the other inmates";

---

[3] Plaintiff also argues, in passing, that evidence of "multiple instances of inconsistent discipline" supports a finding that Koerner caused plaintiff to suffer a violation of her constitutional rights. Doc. 92 at 57. But none of plaintiff's evidence about "inconsistent discipline" involved sexual misconduct. Again, the record fails to identify a single time when a prison official found to have engaged in sexual misconduct with an inmate continued to work at TCF afterwards.

- Gallardo "is never in the classroom with the class and doesn't mind what we do as long as we stay out of trouble";

- Gallardo "has sat in our classroom discussing with inmates their sex life both with men & women.  Him going to the bars, getting drunk, fighting & talking to inmates about [their] fun times";

- "My old man has a tattoo on his dick & [Gallardo] came into the room one day having talked to another inmate who knows my man and asked me about the tattoo & what it stands for";

- On one occasion, "[w]hen I started to leave, [Gallardo] pushed the door on me to make me bump up & leave the room."

Doc. 89-7 at 1-7.  Plaintiff argues that Koerner received this complaint but failed to take any action against Gallardo.  According to plaintiff, Lane's complaint is evidence that Koerner tolerated or ignored sex-related misconduct at TCF.

In response, Koerner first asserts that he never received Lane's complaint.  But plaintiff cites deposition testimony from Deputy Warden William Cummings that, "I believe I turned [the Lane complaint] over to the warden."  Doc. 89-10 at 47:11-47:13.  Thus, a genuine issue of material fact exists whether Koerner received Lane's complaint, which the Court must resolve in plaintiff's favor for purposes of this motion.  *See* Fed. R. Civ. P. 56(a).  The summary judgment facts therefore are that Koerner received Lane's complaint about Gallardo.

Koerner argues that even if he had received Lane's complaint, it does not support a supervisory liability claim against him.  He asserts that TCF did not ignore the complaint completely—it removed Lane from Gallardo's class and placed her in a different one.  Koerner continues his argument, contending that though the allegations in Lane's complaint, if true, show "clearly inappropriate behavior," Doc. 97 at 24, they failed to place Koerner on notice that Gallardo would commit the serious sexual misconduct at issue here.  The Court agrees.  Under the qualified immunity standard, "a local government policymaker is deliberately indifferent

when he deliberately or consciously fails to act when presented with an obvious risk of

constitutional harm which will almost inevitably result in constitutional injury of the type

experienced by the plaintiff." *Schneider*, 717 F.3d at 769 (citation omitted).  The summary

judgment record reveals no complaints against Gallardo other than Lane's.  And while Lane's

complaint shows that Gallardo talked about sex and other inappropriate topics with inmates, it

provides no reason for a rational jury to find that the harm alleged here—a rape—would "almost

inevitably result" if TCF failed to take significant action against Gallardo.  *Id.*  Similarly,

plaintiff has not shown that Gallardo *caused* the constitutional harm by failing to implement

different remedial action after receiving Lane's complaint.  Simply, no evidence exists to suggest

that Koerner "knew or reasonably should have known" that Gallardo would rape an inmate based

on a single complaint not involving sexual misconduct.  *Id.* at 768.

Finally, plaintiff argues, albeit indirectly, that Koerner tolerated sexual misconduct

because he knew that the vocational program in which plaintiff was participating on the day

Gallardo allegedly raped her had certain problems but failed to fix them.  The Kansas state Audit

Report concluded that Koerner "knew of issues with the Maintenance Program [*i.e.*, the

vocational program] before this incident, but he didn't make the changes necessary to remedy

them."  Doc. 92-5 at 18.  According to the report, Koerner was concerned that instructors in the

program received little supervision and that they sometimes went with inmates to buildings that

did not have cameras.  *Id.*  The report also notes that "at least three male staff members

associated with the Maintenance Program were investigated in the two years" before the incident

with plaintiff.  *Id.* at 19.  Importantly, only one of those investigations possibly involved sexual

misconduct.  In that single incident, someone "alleged that a male staff member was alone with

an inmate in a locked room."  *Id.*  The report states:

> To address this issue, the warden established the practice that maintenance staff would no longer be assigned to work with only one inmate.  However, this practice was shown to be ineffective when Gallardo and [plaintiff] had sex while another inmate was in the building with them and acted as a lookout.

*Id.*

Thus, the record shows that when Koerner learned about the possibility of sexual misconduct in the vocational program, he took steps to remedy it.  Specifically, he established a policy that prison staff always would work with more than one inmate.  That this policy turned out, ultimately, not to prevent sexual misconduct does not satisfy the legal standard for deliberate indifference.  An official is deliberately indifferent only "when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Schneider*, 717 F.3d at 769 (citation omitted).  No reasonable factfinder could conclude that a rape in the vocational program "almost inevitably [would] result" in spite of Koerner's remedial actions. *Schneider*, 717 F.3d at 769.  Nor does the record contain any evidence that Koerner knew or should have known that the alleged rape likely would occur under the circumstances presented here.  By requiring that two inmates be present with each instructor at all times, Koerner took remedial action.  Regrettably, his measures did not prevent Gallardo's conduct, but this shortcoming does not satisfy the legal standard for deliberate indifference.

In sum, plaintiff has failed to meet her "heavy" burden to show that Koerner violated her constitutional rights by tolerating sexual misconduct during his time as warden at TCF. *Puller*, 781 F.3d at 1196.  As a consequence, Koerner is entitled to qualified immunity, and the Court thus grants summary judgment against plaintiff's claim.

**IV. Conclusion**

The Court recognizes the serious nature of the facts presented in this case. Sexual contact between prison guards and inmates, consensual or not, serves no penological purpose and is strictly prohibited. *Graham*, 741 F.3d at 1122-23. But as our Circuit has explained, "not all misbehavior by public officials, even egregious misbehavior, violates the Constitution." *Id.* at 1125. Here, plaintiff has failed to carry the burden that the governing law imposes on her claim. She has not adduced evidence from which a reasonable jury could find that Koerner, as Gallardo's supervisor, violated her constitutional rights. Plaintiff therefore has not met her burden on the first prong of the qualified immunity test, and the Court grants Koerner's motion for summary judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Richard D. Koerner's Motion for Summary Judgment (Doc. 88) is granted.

**IT IS SO ORDERED.**

**Dated this 18th day of August, 2015, at Topeka, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**
